<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| UNITED ASSOCIATION OF PLUMBERS & PIPEFITTERS LOCAL 322 OF SOUTHERN NEW JERSEY, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>MALLINCKRODT ARD, LLC, *et al.*,<br><br>Defendants. | : : : : : : : : : : : : : : : | Civil No. 20-188 (RBK/KMW)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

This case concerns allegations of a long running conspiracy to dramatically inflate the price of a venerable drug, H.P. Acthar Gel ("Acthar"). Presently before the Court are a number of motions: Plaintiff United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey's ("Local 322") Motion to Transfer Case to the Eastern District of Pennsylvania (Doc. No. 12); Defendants Mallinckrodt ARD, LLC and Mallinckrodt plc's (collectively, "Mallinckrodt") Motion to Stay Proceedings (Doc. No. 16); Defendants Accredo Health Group, Inc., Cigna Corporation, CuraScript SD, CuraScript, Inc., Cigna Holding Company, Express Scripts Holding Company, Express Scripts, Inc., Priority Healthcare Corp. and Priority Healthcare Distribution, Inc., and United Biosource Corporation's (collectively, "Express Scripts") Motion to Dismiss (Doc. No. 18); Mallinckrodt's Motion to Dismiss (Doc. No. 19);  Defendant Lisa Pratta's Motion to Dismiss (Doc. No. 25); Mallinckrodt and Express Scripts' Joint Motion to Strike (Doc. No. 41);

Pratta's Motion to Strike (Doc. No. 43); Mallinckrodt's Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 49); Express Scripts' Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 50); and Pratta's Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 55).

For the reasons set forth below, Plaintiff's Motion to Transfer is **DENIED**; Mallinckrodt's Motion to Stay is **DENIED**; Mallinckrodt, Express Scripts, and Pratta's Motions to Dismiss are **DENIED** as moot; the Motions to Strike are **DENIED**; Mallinckrodt's Motion to Dismiss the Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**; and Express Scripts and Pratta's Motions to Dismiss are **GRANTED**.

## I.   BACKGROUND[1]

### A.  The Parties

Plaintiff is a Taft-Hartley union fund providing health and welfare benefits to its members and their families. (FAC at ¶ 27). As such, Plaintiff is a "third-party payor" or "TPP" in health care industry parlance. This lawsuit arises from Plaintiff's 2018 payment of $26,100.28 for one administration of Acthar on behalf of one of its beneficiaries. (*Id.* at ¶¶ 27–29, 239).

Acthar is the only therapeutic adrenocorticotropic hormone ("ACTH") product sold in the United States. (*Id.* ¶¶ 3, 64). Mallinckrodt ARD, LLC is the sole manufacturer of Acthar in the United States. (*Id.* at ¶ 3). Since August 2014, Mallinckrodt ARD, LLC has been a wholly-owned subsidiary of Mallinckrodt plc. (*Id.* ¶ 31–33). Prior to its acquisition by Mallinckrodt plc, Mallinckrodt ARD, LLC was known as Questcor Pharmaceuticals, Inc. (*Id.* at ¶ 30). For simplicity, throughout this Opinion the Court will refer to this entity as "Mallinckrodt," even when discussing the time period when it was known as Questcor Pharmaceuticals, Inc.

---

[1] The following facts are drawn from Plaintiff's Amended Complaint (Doc. No. 40 ("FAC")).

Unlike most prescription drugs, Acthar is a "specialty pharmaceutical," meaning that it is not sold in retail pharmacies, but only distributed through "specialty pharmacy distributors" and "specialty pharmacy providers." (*Id.* at ¶ 5). CuraScript, Inc. and its affiliates CuraScript SD and Priority Healthcare Corp. and Priority Healthcare Distribution, Inc. (collectively, "CuraScript") is the specialty pharmacy distributor for Acthar. (*Id.* at ¶¶ 6, 44–46). Accredo Health Group, Inc. ("Accredo") is the specialty pharmacy provider for Acthar. (*Id.* ¶¶ 6, 49). Accredo reviewed and approved the administration of Acthar that Plaintiff paid for, and CuraScript delivered that administration of Acthar to Plaintiff's beneficiary. (*Id.* at ¶¶ 48, 51).

CuraScript and Accredo are wholly-owned subsidiaries of Express Scripts, Inc. (*Id.* at ¶¶ 45, 49). As of December 2018, Express Scripts, Inc. is a wholly-owned subsidiary of Cigna Corporation and Cigna Holding Company. (*Id.* at ¶ 42).

United BioSource Corporation ("UBC") coordinates Acthar sales, distribution, and payment between Mallinckrodt, Express Scripts, patients, physicians, and TPPs. (*Id.* at ¶¶ 52–55). UBC processed the paperwork submitted by Plaintiff to obtain the Acthar dose for its beneficiary. (*Id.* at ¶ 56). Between 2012 and November 2017, UBC was a wholly owned subsidiary of Express Scripts. (*Id.* at ¶ 52). In November 2017, UBC was sold to Avista Capital Partners, a private equity firm; presently, UBC is a wholly owned subsidiary of United BioSource Holdings, Inc., which is held by various entities affiliated with Avista Capital Partners. (*Id.* at ¶ 53).

Lisa Pratta was an Acthar sales representative for Questcor and Mallinckrodt from September 2010 until June 2017. (*Id.* at ¶¶ 59, 401). Pratta was in charge of the South New Jersey region. (*Id.* ¶ 410).

**B. Acthar**

As an ACTH drug, Acthar causes the body to produce cortisone and other steroid hormones. (FAC at ¶ 64). ACTH triggers the adrenal glands to make cortisol, which is equivalent to the steroid prednisone. (*Id.* at ¶ 66). Consequently, taking ACTH effectively replicates the effects of taking prednisone. (*Id.*). Acthar is known generically as corticotropin. (*Id.* at ¶ 102).

Acthar was developed by the Armour Pharmaceutical Company and in 1952 was initially approved by the Food and Drug Administration ("FDA") for over fifty indications. (*Id.* at ¶¶ 63– 65). However, after an FDA review in the 1970s concluded that many of Acthar's indications lacked substantial evidence of effectiveness, Acthar was left with only nineteen approved indications. (*Id.* at ¶¶ 109–112). Today, Acthar's approved indications include the treatment of infantile spasms ("IS"), the acute exacerbations of Multiple Sclerosis ("MS"), and "[a]s adjunctive therapy for short term administrations . . . in the following Rheumatic Disorders: Psoriatic arthritis, Rheumatoid arthritis, including juvenile arthritis . . . [and] Ankylosing spondylitis." (*Id.* at ¶ 120). Many of these indications can be effectively treated by generic corticosteroids, such as prednisone, which are widely available for little more than $4 per dose. (*Id.* at ¶¶ 114–15, 122–34).

By contrast, Acthar does not face competition from these generics in the market for treating IS. (*Id.* at ¶ 114). Indeed, Acthar is the "gold standard" treatment for IS. (*Id.* at ¶ 140). However, the IS treatment market is limited, as the condition affects less than 2,000 children per year. (*Id.*).

### C.  The New Strategy

In 2001, Mallinckrodt acquired Acthar from Aventis Pharmaceutical Products, Inc. for $100,000. (*Id.* at ¶ 138). At the time of Mallinckrodt's acquisition, a vial of Acthar sold for $40. (*Id.* at ¶ 114). Further, Acthar was not approved for treating IS; the FDA would not approve this indication until 2010. (*Id.* at ¶ 140). Nevertheless, between 2001 and 2007, Acthar's primary sales were for treating IS as an off-label indication. (*Id.* at ¶ 141).

4

Plaintiff alleges that in 2007, Mallinckrodt launched an "orphan drug strategy" designed to leverage its market power in the IS treatment market. (*Id.* at 174). Under this plan, Mallinckrodt would attempt to make it appear as though Acthar was a new product by "relaunching" it with a limited distribution system and a substantially higher price, emphasizing that it was the only product available for treating IS. (*Id.* at ¶ 174). Plaintiff alleges that this plan had three distinct elements: (1) a "distribution scheme,"  by which Mallinckrodt made Express Scripts the sole distributor of Acthar; (2) a "pricing scheme," by which Mallinckrodt dramatically inflated the price of Acthar; and (3) a "marketing scheme" by which Mallinckrodt and Express Scripts disseminated misleading information about the safety and efficacy of Acthar in order to maintain and even grow demand despite the price increases.

*i.   The "Distribution Scheme"*

Prior to Mallinckrodt's acquisition, Acthar was distributed to any doctor, hospital, wholesaler, or specialty pharmacy who requested the drug. (*Id.* at ¶ 152). However, on July 2, 2007, Mallinckrodt restricted distribution of Acthar to Express Scripts. (*Id.* at ¶ 153). Specifically, Mallinckrodt entered into an exclusive distribution agreement with CuraScript. (*Id.* at ¶¶ 44–46, 163). Mallinckrodt also entered into an agreement with UBC whereby UBC would coordinate the sale, distribution, and reimbursement for Acthar. (*Id.* at ¶¶ 154, 163).

With the CuraScript and UBC agreements in place, Mallinckrodt implemented a new distribution program known as the "Acthar Support & Access Program" ("ASAP"). (*Id.* at ¶ 180). Under the ASAP, the only way for a patient or physician to obtain Acthar is by completing an Acthar Start Form and faxing it to UBC. (*Id.* at ¶ 184). Upon receipt of this form, UBC confirms the prescription by the provider and the associated specialty pharmacy and confirms the patient's insurance. (*Id.* at ¶ 185). If everything checks out, UBC arranges for CuraScript to deliver the

Acthar directly to the patient. (*Id.*). UBC also receives payment from the patient and/or their TPP and then distributes payment to Mallinckrodt. (*Id.* at ¶ 189). Mallinckrodt maintains all rights, title, and interest in the Acthar until UBC approves delivery to the patient. (*Id.* at ¶ 191).

### ii.   The "Pricing Scheme"

Upon its acquisition of Acthar, Mallinckrodt moved quickly to increase the price, and by September 2001 the average wholesale price ("AWP") was $935.20. (*Id.* at ¶ 209).[2] By 2007, the AWP had grown to $2,062.79. (*Id.* at ¶ 211). After Mallinckrodt implemented the new strategy in August 2007, Acthar's AWP increased dramatically to $29,086.25—a 1,310% increase in the span of a month. (*Id.* at ¶ 214). Once Mallinckrodt obtained FDA approval for the IS indication in 2010, it increased the AWP of Acthar again, such that by 2012 the AWP was $34,150.00. (*Id.* at ¶ 215). Plaintiff alleges that CuraScript and UBC conspired with Mallinckrodt to effectuate at least some of these price increases. (*Id.* at ¶¶ 13, 214).

Further, Plaintiff claims that Mallinckrodt has made misleading or inaccurate statements about its Acthar pricing strategy at various other times. (*Id.* at ¶¶ 550–54).  For example, in 2018 Mallinckrodt's CEO, Mark Trudeau, stated that the AWP of Acthar was only $36,382, and that Mallinckrodt offers discounts to public and private payers. (*Id.* at ¶ 233).[3] Yet by 2018, the AWP of Acthar was over $40,000, and Plaintiff alleges that Mallinckrodt does not offer any discounts to TPPs. (*Id.* at ¶ 234).

### iii.   The "Marketing Scheme"

---

[2] Like other drug manufacturers, Mallinckrodt set the wholesale acquisition cost ("WAC") for Acthar and then charged a 25% markup. (*Id.* at ¶ 209). As such, the AWP is 25% above the WAC.

[3] According to Plaintiffs, TPPs determine reimbursement payments for prescriptions based on the AWPs reported by pharmaceutical industry publications. (*Id.* at ¶ 242). Further, Plaintiff alleges that Mallinckrodt was supplying "false" AWPs to these publications in an effort to manipulate the price actually paid by TPPs. (*Id.* at ¶¶ 242–45). However, Plaintiff also seems to assert that it and other TPPs actually paid the inflated AWP set by Mallinckrodt for Acthar. (*Id.* ¶ 229). Consequently, it is unclear what was "false" about the AWPs reported by Mallinckrodt to the industry publications.

Accompanying the distribution restrictions and the price increases, Plaintiff alleges that Mallinckrodt engaged in a fraudulent scheme to pump up demand for Acthar. In particular, Mallinckrodt aimed to convince doctors to prescribe Acthar not only for its FDA approved indications, which are mainly the acute treatment of rare conditions, but also as a long-term "maintenance medication" for a wider range of conditions, despite the absence of scientific evidence supporting such use. (*Id.* at ¶¶ 586–88).

In 2007, Mallinckrodt created a new position within the company: "Medical Science Liaison" or "MSL." (*Id.* at ¶ 266). MSLs were deployed to speak to doctors about the safety and efficacy of Acthar for off-label indications. (*Id.*). However, Mallinckrodt also had the MSLs engage in promotional activities alongside sales representatives. (*Id.* at ¶ 269). When engaging in promotional activities, the MSLs made inaccurate claims about Acthar's efficacy, for example by pushing physicians to prescribe Acthar to MS patients in lieu of Solu-Medrol, even though Mallinckrodt knew that Solu-Medrol was cheaper and more effective than Acthar at treating MS. (*Id.* at ¶ 270).

Mallinckrodt also cultivated "Key Opinion Leaders" or "KOLs" to create data to support its marketing efforts for Acthar. (*Id.* at ¶¶ 271–72). These KOLs included doctors who frequently prescribed Acthar and were paid by Mallinckrodt to produce research supporting a broad use of Acthar. (*Id.* at 274–76).

Mallinckrodt's efforts resulted in many Acthar prescriptions being written by doctors who were being paid by the company. For example, in 2015 there were 300 prescribing providers who wrote more than ten Acthar prescriptions for Medicare and Medicaid patients, of whom at least 207 received payments from Mallinckrodt. (*Id.* at ¶¶ 280–82). Mallinckrodt also began a "white coat" marketing effort, working with doctors in fields in which Acthar was not an approved course

of treatment to generate data supporting its use. (*Id.* at ¶¶ 296–302). All the while, these doctors and Mallinckrodt knew that little scientific evidence actually supported the off-label uses of Acthar. (*Id.* at ¶ 448).

UBC employees also misrepresented the safety and efficacy of Acthar to patients and doctors. (*Id.* at ¶¶ 374–75). Further, UBC aids Mallinckrodt in running the "Patient Assistance Program" or "PAP," the aim of which is to make Acthar free to patients by subsidizing their copayments. (*Id.* at ¶ 379). To achieve this aim, Mallinckrodt had a foundation called the Chronic Disease Fund ("CDF") establish "patient assistance" funds that would be used for Acthar copayments only. (*Id.* at ¶ 381). Next, Mallinckrodt funded these patient assistance funds. (*Id.*). When patients or physicians submitted ASAP start forms to UBC, UBC would automatically provide these patients with an offer of copay assistance through the CDF. (*Id.* at ¶ 382).

Plaintiff alleges that Pratta participated in Mallinckrodt's misleading marketing efforts by hosting dinners for KOLs to encourage the promotion of Acthar for off-label dosing. (*Id.* at ¶ 412). Specifically, on February 15, 2013 and on March 15, 2013, Pratta hosted dinners at which she an Acthar KOL promoted Acthar for an unapproved five-day dosing regimen to various other doctors. (*Id.* at ¶¶ 413–12).

### D. Anticompetitive Acquisitions

While Mallinckrodt raised the price of Acthar in the late 2000s and early 2010s, Novartis AG ("Novartis") was busy developing a potential competitor, Synacthen Depot ("Synacthen"), a synthetically derived ACTH medication. (*Id.* at ¶ 476). Although Synacthen was used outside the United States, it did not yet have FDA approval. (*Id.*). Mallinckrodt attempted to buy the rights to Synacthen in 2009 but did not succeed. (*Id.*).

In 2013, Novartis agreed to sell Synacthen to Retrophin, Inc. ("Retrophin") for $16 million. (*Id.* at ¶ 477). Rather than let the sale go through, Malinckrodt intervened in the bidding process at the last minute, ultimately agreeing to acquire the rights to Synacthen for somewhere between $135 million and $300 million. (*Id.* at ¶¶ 524). After acquiring Synacthen, Mallinckrodt never took any steps to bring it to market in the United States. (*Id.* at ¶¶ 481, 534).

In January 2014, Retrophin sued Mallinckrodt for antitrust violations relating to the Synacthen acquisition, as did the Federal Trade Commission ("FTC") in 2017. (*Id.* at ¶¶ 526–29). Mallinckrodt ultimately settled the Retrophin lawsuit for $15.5 million, and the FTC lawsuit for $100 million. (*Id.* at ¶¶ 530, 536). The FTC also required Mallinckrodt to sublicense the rights to Synacthen to another company that could then attempt to bring Synacthen to market. (*Id.* at ¶ 481).[4]

Around the same time that Mallinckrodt moved to fend off the horizontal competitive threat posed by Synacthen, Mallinckrodt also worked to secure its vertical supply chain. Since 2003, BioVectra Inc. ("BioVectra") has been the only supplier of the Acthar Active Pharmaceutical Ingredient ("API"). (*Id.* at ¶ 564). In January 2013, Mallinckrodt purchased BioVectra. (*Id.*). Plaintiff alleges that the BioVectra acquisition gave Mallinckrodt the ability to deny any potential horizontal competitors access to the necessary samples of the Acthar API they would need to secure FDA approval of an Acthar generic drug. (*Id.* at ¶¶ 564-65).

### E.  Related Lawsuits

Since 2012, there have been a number of lawsuits filed against Mallinckrodt and Express Scripts related to the conduct described above. The Court limits its discussion to the four cases the

---

[4] While the existence of these settlement agreements cannot be used to prove the validity of Plaintiff's claims, there is no need to strike them from the Amended Complaint as Mallinckrodt urges the Court to do. *See Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 243 (E.D. Pa. 2012) (explaining that "[r]elief under Rule 12(f) is generally disfavored and will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case" (internal quotations omitted)).

parties have identified as being especially salient to the pending Motion to Transfer and Motion to Stay.

          i.   *The* Qui Tam *Suits*

In 2012, Pratta and another Mallinckrodt employee, Charles Strunck, filed a *qui tam* lawsuit against Mallinckrodt in the Eastern District of Pennsylvania. *See* Fourth Amended Complaint, *United States ex rel. Pratta v. Questcor Pharm., Inc.*, No. 12-175 (E.D. Pa. June 13, 2017) (Doc. No. 40). This lawsuit principally seeks to recover damages on behalf of the United States and various states and municipalities for violations of the federal False Claims Act, 31 U.S.C. § 3729, and state law equivalents due to Mallinckrodt's fraudulent marketing of Acthar. *Id.* In 2013, another Mallinckrodt employee, Scott Clark, filed a similar *qui tam* complaint in the Eastern District of Pennsylvania. *See* Sealed Complaint, *United States ex rel. Clark v. Questcor Pharm., Inc.*, No. 13-1776 (E.D. Pa. Apr. 4, 2013) (Doc. No. 1). In March 2019, the United States elected to intervene in both cases, which were subsequently consolidated for further proceedings. *See* Order to Consolidate, *United States ex rel. Pratta v. Questcor Pharm., Inc.*, No. 12-175 (E.D. Pa. July 8, 2019) (Doc. No. 70).

          ii.   *The Rockford Case*

In April 2017, the City of Rockford, Illinois and Acument Global Technologies Inc., represented by the same counsel as Plaintiff in this case, filed a class action complaint against Mallinckrodt and Express Scripts in the Northern District of Illinois. *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17-50107 (N.D. Ill. Apr. 6, 2017) (Doc. No. 1). After a considerable amount of procedural back and forth, the plaintiffs filed a second amended complaint which alleged violations of federal and state antitrust and consumer protection laws, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various other state

laws. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 743 (N.D. Ill. 2019). In January 2019, the *Rockford* court granted in part and denied in part defendants' motions to dismiss, permitting the City of Rockford's federal and state law antitrust claims to survive. *Id.* at 778. The case does not involve any claims under New Jersey law.

### iii.   The MSP Case

In October 2017, MSP Recovery Claims, Series LLC filed a class action complaint against Mallinckrodt and Express Scripts in the Central District of California, which was transferred to the Northern District of Illinois in January 2018 to be coordinated with the *City of Rockford* case. *See MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, No. 17-7928, 2018 WL 2589014 (C.D. Cal. Jan. 17, 2018). This lawsuit brings claims for violations of both the federal Sherman Antitrust Act, 15 U.S.C. §§ 1–3, as well as a number of state antitrust and consumer protection statutes relating to the defendants' marketing, distribution, and pricing of Acthar. Redacted Second Amended Complaint, *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, No. 20-50056 (N.D. Ill. July 2, 2020) (Doc. No. 361). The *MSP* case does not bring any claims under New Jersey law.

### iv.   The Steamfitters Case

In July 2019, Steamfitters Local Union No. 420, represented by the same counsel as Plaintiff, filed a class action complaint against Mallinckrodt and UBC in the Eastern District of Pennsylvania. Complaint, *Steamfitters Local Union No. 420 v. Mallinckrodt ARD, LLC*, No. 19-3047 (E.D. Pa. July 12, 2019) (Doc. No. 1). The complaint alleges violations of the federal RICO statute and a number of state consumer protection laws relating to Mallinckrodt and UBC's marketing and distribution of Acthar. *Id.* The complaint does not bring any claims under New Jersey law. *Id.* On December 19, 2019, the *Steamfitters* court issued a one-page order denying

defendants' motions to dismiss, providing virtually no explanation for its decision. *Steamfitters Local Union No. 420 v. Mallinckrodt ARD, LLC*, No. 19-3047 (E.D. Pa. Dec. 19, 2019).

### F.  Procedural History of This Case

Plaintiff filed its initial complaint on November 22, 2019, in the New Jersey Superior Court. (Doc. No. 1 at ¶ 2). On January 6, 2020, Mallinckrodt timely removed. (*Id.* at ¶ 21). On January 15, 2020, Plaintiff filed its Motion to Transfer the Case to the Eastern District of Pennsylvania. On January 24, 2020, Mallinckrodt filed a Motion to Stay the case and Express Scripts filed a Motion to Dismiss. Mallinckrodt filed its own Motion to Dismiss on January 27, 2020, as did Pratta on January 29, 2020.

Plaintiff failed to timely respond to Express Scripts' Motion to Dismiss, instead filing a Motion for an Extension of Time (Doc. No. 35) to respond until after the Court had ruled on the Motion to Transfer and the Motion to Stay. The Court granted Plaintiff's request in part, allowing it "until March 2, 2020 to file its *opposition briefs* in response to the Motions to Dismiss." (Doc. No.  39) (emphasis added). Instead of filing opposition briefs, Plaintiff filed its Amended Complaint on February 20, 2020. (Doc. No. 40). In response, Mallinckrodt and Express Scripts filed a Joint Motion to Strike the Amended Complaint (Doc. No. 41). The Court set an accelerated briefing schedule, requiring Plaintiff to respond on or before March 3, 2020. (Doc. No. 42). Pratta then filed her own Motion to Strike (Doc. No. 43).

Plaintiff chose to keep its options open by filing opposition briefs to all three pending Motions to Dismiss and the Motions to Strike on March 3. (Doc. Nos. 44, 45, 46, 47). Mallinckrodt and Express Scripts then filed Motions to Dismiss the Amended Complaint on March 5, 2020 (Doc. Nos. 49, 50), and Pratta filed a Motion to Dismiss the Amended Complaint (Doc. No. 55) on March 11, 2020.

Plaintiff's Amended Complaint has seven counts: Count I brings a claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8–1, *et seq.*; Count II brings a claim under the New Jersey Antitrust Act ("NJAA"), N.J.S.A. 56:9–1, *et seq.*; Count III alleges violations of the New Jersey RICO statute ("NJ RICO"), N.J.S.A. 2C:41–2(c); Count IV alleges conspiracy to violate NJ RICO under N.J.S.A. 2C:41–2(d); Count V alleges negligent misrepresentation; Count VI alleges civil conspiracy; and Count VII alleges unjust enrichment.

## II.   MOTION TO TRANSFER AND MOTION TO STAY

Plaintiff argues that this case should be transferred to the Eastern District of Pennsylvania so that it can be coordinated with the ongoing *qui tam* and *Steamfitters* lawsuits. Mallinckrodt and Express Scripts oppose Plaintiff's motion, and Mallinckrodt instead asserts that this case should be stayed while those lawsuits and the coordinated *City of Rockford* and *MSP* cases play out. Both sides assert that the "first-filed" rule applies, enabling the Court to take their preferred course of action. They are wrong.

### A.  The "First-Filed" Rule

The first-filed rule mandates that, "'in all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it.'" *Samsung Elecs. Co., Ltd. v. Imperium Holdings (Cayman), Ltd.*, 764 F. App'x 199, 200 (3d Cir. 2019) (quoting *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941)). The rule applies when the first-filed case is "materially on all fours" with the second-filed case in a way that is basically determinative of the second-filed case. *Grider v. Keystone Health Plan Ctr., Inc.*, 500 F.3d 322, 333 n.6 (3d Cir. 2007); *see also Complaint of Bankers Tr. Co. v. Chatterjee*, 636 F.2d 37, 40 (3d Cir. 1980) (noting that "[w]hen the claims, parties, or requested relief differ, deference may not be appropriate"). However, the "rule" is not to be applied woodenly, providing district courts with discretion to

dismiss, stay, transfer or continue to adjudicate the later-filed case. *See EEOC v. Univ. of Pa.*, 850 F.2d 969, 976–77 (3d Cir. 1988); *Maximum Human Performance, Inc. v. Dymatize Enters., Inc.*, No. 09-235, 2009 WL 2778104 (D.N.J. Aug. 27, 2009).

When determining whether two or more cases are materially on all fours with each other, courts look to both the subject-matter of the lawsuits and the identities of the parties. If the factual allegations in the two cases are the same, minor differences in the causes of action and remedies sought are insufficient to prevent application of the first-filed rule. *See Maximum Human Performance,* 2009 WL 2778104 at *4 (holding that the first-filed rule applied when the two actions were brought under different statutes but related to the same subject-matter); *Palagan v. NVIDIA Corp.*, 2015 WL 5025469 at *4 (E.D. Pa. 2015). Similarly, the parties to the two lawsuits need not be identical, but only "essentially the same." *Abushalieh v. Am. Eagle Express*, 716 F. Supp. 2d 361, 366 (D.N.J. 2010) (internal quotation omitted).

However, courts generally decline to apply the first-filed rule if there are differences in the causes of action *and* the identities of the parties. *See Atanassov v. Amspec Servs., LLC*, 2016 WL 740269, at *3 (finding that class action on behalf of inspectors and dispatchers for Fair Labor Standards Act ("FLSA") violations was not duplicative of suit only on behalf of inspectors seeking relief under the FLSA *and* state law); *Abushalieh*, 716 F. Supp. 2d at 365 (finding that FLSA collective action on behalf of delivery drivers in several states including Pennsylvania was not duplicative of earlier filed class action seeking relief under Pennsylvania wage and hour laws on behalf of Pennsylvania delivery drivers); *see also Glover v. Ferrero USA, Inc.*, No. 11-1086, 2011 WL 5007805, at *5 (D.N.J. Oct. 20, 2011) (holding that first-filed rule did not apply where one action set forth nationwide class claims under California law while the other set forth nationwide class claims under New Jersey law).

This case exclusively involves claims under New Jersey law by a class of New Jersey citizens. (FAC at ¶¶ 1, 420). While the *qui tam*, *City of Rockford*, *MSP*, and *Steamfitters* cases all involve similar factual allegations against Mallinckrodt and Express Scripts and rely on analogous causes of action, none of them bring claims under New Jersey law, and none of them involve an exclusive class of New Jersey residents. Further, Pratta is only named as a defendant in this action. *See Kedia v. Jamal*, No. 06-6054, 2007 WL 1239202, at *3 (D.N.J. Apr. 25, 2007) (finding that first-filed rule did not apply where individual was only named as a defendant in one case). And although Defendants accuse Plaintiff of forum-shopping, (Doc. No. 16-4 at 5), the Court has no authority to apply the first-filed rule to combat forum-shopping "when the rule's narrow requirements are not met." *Atanassov*, 2016 WL 740269, at *3 (noting that forum-shopping may be a reason to retain jurisdiction despite applicability of the first-filed rule but is not a sufficient reason to apply the rule in the first instance).

### B.  Transfer Pursuant to 28 U.S.C. § 1404(a)

In the alternative, Plaintiff urges the Court to transfer the case to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).  (Doc. No. 12-1 at 16–20). "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In contrast to transfer of venue under 28 U.S.C. § 1406, where the court finds the original venue improper, transfer of venue is done under § 1404(a) "for the convenience of the parties even if the court finds that the original venue is proper." *Ferratex, Inc. v. U.S. Sewer & Drain, Inc*., 121 F. Supp. 3d 432, 436 (D.N.J. 2015).

The decision whether to transfer an action pursuant to Section 1404(a) is within the Court's discretion. *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 872 (3d Cir. 2013); *Lepre v.*

*Lukus*, 602 F. App'x 864, 868 (3d Cir. 2015), *cert. denied*, 575 U.S. 969 (2015). The party seeking transfer of venue bears the burden of establishing that transfer is warranted and must submit "sufficient information in the record" to facilitate the Court's analysis. *Hoffer v. InfoSpace.com, Inc.*, 102 F. Supp. 2d 556, 572 (D.N.J. 2000). Before transferring venue, the Court must articulate specific reasons for its decision. *Lawrence v. Xerox Corp.*, 56 F. Supp. 2d 442, 451 (D.N.J. 1999).

Under 28 U.S.C. § 1404(a), the court must take into account a wide range of public and private interests when determining if a transfer to a new venue is appropriate. The Third Circuit has identified the following private factors as being significant to the § 1404(a) analysis:

> [1] [P]laintiff's forum preference as manifested in the original choice; [2] the defendant's preference; [3] whether the claim arose elsewhere; [4] the convenience of the parties as indicated by their relative physical and financial condition; [5] the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and [6] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (citations omitted). Among the public factors that courts consider are the following:

> [1] [T]he enforceability of the judgment; [2] practical considerations that could make the trial easy, expeditious, or inexpensive; [3] the relative administrative difficulty in the two fora resulting from court congestion; [4] the local interest in deciding local controversies at home; [5] the public policies of the fora; and [6] the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879–80 (citations omitted). The movant bears "[t]he burden of establishing the need for transfer." *Id.* at 879 (internal quotations omitted).

Defendants concede that this case could have been brought in the Eastern District of Pennsylvania but assert that the private and public interests counsel against transfer. (Doc. No. 30 at 19–25). The Court agrees with Defendants. All of the private interests weigh against transfer: Plaintiff initially chose to litigate in New Jersey, Defendants wish to continue litigating here,

Plaintiff and the class members' claims all arose in New Jersey, and as the James A. Byrne Courthouse in Philadelphia is visible from the upper floors of the Mitchell H. Cohen Courthouse in Camden, the Court cannot conceive of any meaningful inconvenience or difficulty posed by continued litigation in New Jersey as opposed to the Eastern District of Pennsylvania. As Plaintiff makes no argument that any of the public factors cut in its favor, the Court will deny its Motion. And because the first-filed rule does not apply, the Court will also deny Mallinckrodt's Motion to Stay.

## III. INITIAL MOTIONS TO DISMISS AND MOTIONS TO STRIKE

Under Federal Rule of Civil Procedure 15(a)(1)(B), a plaintiff may amend its complaint as a matter of right within twenty-one days after service of a Rule 12(b) motion. If the plaintiff tarries, it may amend its complaint "only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). However, the Court "should freely give leave when justice so requires." *Id.*; *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (asserting that Rule 15 should be applied liberally to avoid deciding cases on technicalities). Courts generally only deny leave to amend in certain circumstances, such undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice, or clear futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Fed. Deposit Ins. Corp. v. Bathgate*, 27 F.3d 850, 874 (3d Cir. 1994).

In this case, Plaintiff filed its Amended Complaint on February 25, 2020—26 days after Express Script's Motion to Dismiss was filed, 23 days after Mallinckrodt's Motion to Dismiss was filed, but exactly 21 days after Pratta's Motion to Dismiss was filed. *See* Fed.R.Civ.P. 6(a)(1)(A) (explaining that when calculating deadlines under the Rules, one must "exclude the day of the event that triggers the period"). As such, Plaintiff's Amended Complaint was timely as to Pratta.

Further, Mallinckrodt and Express Scripts concede that the Amended Complaint does not materially change any of the allegations against them, (Doc. No. 41-1 at 4), and their briefs in support of their Motions to Dismiss the Amended Complaint are identical to their original motions, save for changes to the paragraph numbers in their citations to the Amended Complaint. Consequently, Mallinckrodt and Express Scripts have no material claim of prejudice.

While the Court regrets that the briefing became so confused, at this point the simplest way forward is clearly to permit the Amended Complaint to stand and to adjudicate the Motions to Dismiss the Amended Complaint. Therefore, the Motions to Strike will be denied and the initial Motions to Dismiss will be denied as moot.[5]

## IV.   MALLINCKRODT AND EXPRESS SCRIPTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

### A.  Legal Standard

#### i.  Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty.*

---

[5] Hypothetically, if the Court were to grant the motions to strike and then grant the initial motions to dismiss, such dismissal would almost surely be without prejudice. As a result, Plaintiff would be able to file an amended complaint anyway. Therefore, no one really has anything to gain by striking the Amended Complaint and adjudicating the initial Motions to Dismiss as opposed to proceeding to simply adjudicate the Motions to Dismiss the Amended Complaint.

The Court notes that Plaintiff has failed to file opposition briefs to Mallinckrodt and Express Scripts' Motions to Dismiss the Amended Complaint. As many months have gone by, the Court assumes that Plaintiff has no interest in doing so. Nevertheless, because Mallinckrodt and Express Scripts' Motions to Dismiss the Amended Complaint are virtually identical to their initial Motions to Dismiss, the Court will treat Plaintiff's Opposition briefs to those motions as if they were in response to the later filed motions.

*of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

### ii.   Rule 9(b)

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To satisfy Rule 9(b)'s particularity requirement, a plaintiff must: (1) "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged"; and (2) "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal citations omitted). As the Third Circuit has

explained, Rule 9(b) requires a plaintiff to provide "the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted).

### B.  Collateral Estoppel

As discussed above, in January 2019 the *City of Rockford* court denied in part motions to dismiss filed by Mallinckrodt and Express Scripts, permitting the City of Rockford's antitrust claims relating to Acthar to survive, and in December 2019 the *Steamfitters* court denied motions to dismiss filed by Mallinckrodt and UBC, allowing the plaintiff's federal RICO claims to survive. In light of these rulings, Plaintiff contends that Mallinckrodt and Express Scripts are barred by the doctrine of collateral estoppel from seeking dismissal of Plaintiff's NJAA and NJ RICO claims. (Doc. No. 44 at 18; Doc. No. 45 at 17–18).

Plaintiff's argument is absurd. "Collateral estoppel bars relitigation of an issue where (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Gross-Quatrone v. Mizdol*, 811 F. App'x 95, 97, 97 n.4 (3d Cir. 2020) (internal quotation omitted) (noting that "[t]he elements for issue preclusion under federal common law and New Jersey law are almost identical" (internal quotation omitted)) . Neither the *City of Rockford* court nor the *Steamfitters* court has yet issued a "final judgment," meaning that the doctrine of collateral estoppel is obviously inapplicable. Indeed, these rulings have no binding precedential effect beyond their capacity to persuade. *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) (noting that "*stare decisis* does not compel one district court judge to follow

the decision of another" (internal quotation omitted)). While the *City of Rockford* court issued a thorough opinion that the Court has carefully considered, the *Steamfitters* court's one-page order has no persuasive power. With these principles in mind, the Court turns to the merits of Plaintiff's various claims.

### C.  NJCFA (Count I)

The *prima facie* case for an NJCFA violation has three elements: "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). Because the NJCFA was enacted to protect "consumers," "business entities" may only bring claims under the act when they are in a "consumer oriented situation." *J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (internal quotation omitted). A business entity is in a "consumer oriented situation" when it "uses economic goods, and so diminishes or destroys their utilities." *Cent. Reg'l Emp. Benefit Fund v. Cephalon*, No. 09-3418, 2009 WL 3245485, at *3 (D.N.J. Oct. 7, 2009) (internal quotation omitted).

Because TPPs, like Plaintiff, "essentially serve as middlemen or insurers, paying all or part of the cost of a beneficiary's drugs in return for a stream of payments from the beneficiary," they are not "consumers entitled to sue under the NJCFA." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 06-5774, 2009 WL 2043604, at *32 (D.N.J. July 10, 2009); *see also MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019) (finding TPP plaintiffs lacked standing to sue under the NJCFA); *Cephalon*, 2009 WL 3245485, at *3) (same). As Plaintiff cannot plead that it is not a TPP, any attempt to amend would be futile, and so this claim will be dismissed with prejudice.

*See Cephalon*, 2009 WL 3245485, at *3 (dismissing TPP plaintiffs' NJCFA claims with prejudice).

### D. NJAA (Count II)

Plaintiff's antitrust claims focus on the ASAP program, through which Mallinckrodt and Express Scripts fixed Acthar's price and restricted its distribution, and on the Synacthen acquisition, by which Mallinckrodt prevented the entry of a new competitor into the ACTH market. Plaintiff is proceeding solely under the NJAA, specifically invoking the act's provisions barring anticompetitive agreements, N.J.S.A. 56:9–3, and conspiracy to monopolize, N.J.S.A. 56:9–4(a).[6] (FAC at ¶ 623). Because New Jersey courts "follow federal antitrust law in interpreting [the NJAA]," *Wilson v. General Motors Corp.*, 921 A.2d 414, 416 (N.J. 2007) (citing N.J.S.A. 56:9–18), the Court relies on caselaw applying the federal antitrust statutes when analyzing Plaintiff's claims.

As with Sherman Act Section 1 claims, a plaintiff bringing a Section 56:9–3 claim must allege: "(1) concerted action by the defendants; [(2)] that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). Similarly, to state a conspiracy to monopolize claim under Section 56:9–4(a), a plaintiff must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Id.*

---

[6] Like Sherman Act Section 2, NJAA Section 56:9–4(a) prohibits three distinct types of conduct—monopolization, attempted monopolization, and conspiracy to monopolize. Neither the Amended Complaint nor Plaintiff's briefing explicitly states which of these theories Plaintiff is pursuing. However, Plaintiff's heavy reliance on the *City of Rockford* case, where the plaintiffs apparently only pursued a conspiracy to monopolize theory, 360 F. Supp. 3d at 755–56, leads the Court to assume that Plaintiff is similarly only pursuing a conspiracy theory. If Plaintiff wishes to pursue a monopolization and/or attempted monopolization theory, it must attempt to amend its Amended Complaint to make that desire clear.

Because the relevant elements largely overlap for the theories of anticompetitive harm Plaintiff is pursuing, the Court analyzes Plaintiff's anticompetitive agreement and conspiracy to monopolize claims in tandem. Ultimately, the Court finds that Plaintiff has a viable claim against Mallinckrodt for its acquisition of Synacthen, but that its other antitrust claims fail.

### i. *Claims Regarding the ASAP Program*

While some types of restraints "are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output," most restraints are evaluated under the "rule of reason," which requires the Court to assess whether the restraint actually harms consumers. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (internal quotations omitted). The restraints enforced by the ASAP program are vertical restraints because they were "imposed by agreement between firms at different levels of distribution," and virtually all vertical restraints are evaluated under the rule of reason. *Id.* Plaintiff offers no reason why the rule of reason should not apply here. Consequently, Plaintiff must allege that the ASAP program has an anticompetitive effect within the relevant product and geographic markets.

Mallinckrodt and Express Scripts make three main arguments as to why Plaintiff's challenge to the ASAP Program fails. First, Mallinckrodt contends that Plaintiff has failed to establish a plausible product market. (Doc. No. 49-2 at 29–30). Second, Mallinckrodt asserts that Plaintiff has not provided sufficient allegations of an agreement between Mallinckrodt and Express Scripts to fix prices. (*Id.* at 23–25). Third, Mallinckrodt and Express Scripts both argue that Plaintiff has not adequately pleaded any anticompetitive effects stemming from the ASAP Program. (*Id.* at 20–23, 26–27; Doc. No. 50-1 at 34–37).

### 1.  Product Market

Plaintiffs challenging vertical restraints under the rule of reason must show that those restraints harmed competition in the relevant product market, defined as "the area of effective competition" or "the arena within which significant substitution in consumption or production occurs." *Am. Express*, 138 S. Ct. at 2285, 2285 n.7 (internal quotations omitted). The market must "reflect[] commercial realities." *Id.* at 2285 (internal quotation omitted). Typically, product market definition is a question of fact that cannot be adjudicated until after discovery, but a motion to dismiss may be granted "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

Plaintiff defines the relevant product market in this case as "ACTH drugs," with Acthar being the only product currently available in the market. As Mallinckrodt points out, this proposed market seems troubling at first, because it excludes the generic drugs that Plaintiff repeatedly alleges are equally effective for the treatment of many of Acthar's approved indications. (FAC at ¶¶ 115, 117). However, Plaintiff also alleges that patients and physicians do not substitute these drugs for Acthar; indeed, Mallinckrodt was able to increase sales in the theoretically competitive indications even as it dramatically raised prices. (FAC at ¶¶ 286, 399–405). Given the absence of cross-elasticity of demand between Acthar and its generic alternatives, the commercial reality seems to be that Acthar really is in its own market. *See United Food & Commercial Workers Local 1776 & Participating Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1171–72 (N.D. Cal. 2017) (noting that "in the pharmaceutical context courts have limited the market to similar classes or drugs or even more narrowly, to the brand product itself in absence of cross-elasticity evidence" (citing *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1064 (3d

Cir. 1978); *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004))). Further, Plaintiff also alleges that Acthar is uniquely effective at treating IS, an indication for which it faces zero competition. (FAC at ¶¶ 140, 175–75). As ACTH drugs are insulated from competition and have a salient distinguishing characteristic, Plaintiff's proposed product market is adequate to survive a motion to dismiss.

2.   Existence of an Agreement

A "single entity" is incapable of conspiring with itself to unreasonably restrain trade. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 194–95 (2010). Because "'substance, not form, should determine whether an entity is capable of conspiring,'" legally separate entities are sometimes considered single entities for antitrust conspiracy purposes. *Id.* at 194–95 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)). For example, "a parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other.'" *Am. Needle*, 560 U.S. at 194 (quoting *Copperweld*, 467 U.S. at 777)). When making this determination, the key question is "whether there is a contract, combination, or conspiracy amongst separate economic actors pursuing separate economic interests." *Am. Needle*, 506 U.S. at 195 (internal quotation omitted).

Under this doctrine, a corporation is sometimes considered to be a single entity with its sales agent, such that the two cannot enter into a price-fixing conspiracy. *See United States v. General Elec. Co.*, 272 U.S. 476, 488 (1926) (holding that "genuine contracts of agency" cannot violate the Sherman Act); *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 21–23 (1964) (finding that a sham consignment relationship did not shield the defendant from antitrust liability); *see also Am. Needle*, 560 U.S. at 195 n.4 (holding that the *Copperweld* functional test should be used to

determine if an agency relationship is "genuine" and therefore immune from antitrust scrutiny). "Genuine" agency relationships are immunized because "one of the benefits of manufacturing a good is to set the price by which it is sold" meaning "it is only sensible not to deprive the manufacturer of its right if, for reasons of efficiency, it chooses to use agents that are loyal to it rather than employees." *Valuepest.com of Charlotte v. Bayer Corp.*, 561 F.3d 282, 288 (4th Cir. 2009). When determining whether an agency relationship is genuine or merely a sham, courts consider the "distribution of business risks," "the economic justification for the agency relationship," and "whether the agency agreement is a product of coercion." *Id.* at 290–91(citing *Day v. Taylor*, 400 F.3d 1272, 1278 (11th Cir. 2005)).

In this case, Plaintiff alleges that Mallinckrodt sells Acthar on consignment, with Express Scripts simply serving as its sales agents. (FAC at ¶ 191). As Plaintiff describes it, possession never passes from Mallinckrodt to Express Scripts, but only from Mallinckrodt to the consumer directly, and Plaintiff specifically alleges that Mallinckrodt always bears the full risk of loss. (*Id.*). Further, Plaintiff does not allege that Mallinckrodt coerced Express Scripts into this relationship. Thus, Plaintiff has pleaded a genuine agency relationship between Mallinckrodt and Express Scripts, meaning that they are a single entity for price-fixing conspiracy purposes. *See Day*, 400 F.3d at 1277–78 (finding that U-Haul dealers were genuine agents where U-Haul bore the costs of the equipment and exercised no coercive power over its dealers). But while an agency relationship requires pricing agreements, it does not require exclusivity, and therefore this reasoning does not preclude Plaintiff's challenge to Express Script's exclusive distributorship of Acthar.

### 3.   Anticompetitive Effects of the Exclusive Distributorship

Plaintiff fails to show that Express Scripts' exclusive distributorship had an adverse effect on competition.[7] Exclusive distributorship arrangements are often upheld on antitrust challenges because they can have substantial procompetitive benefits, such as "to assure supply, price stability, outlets, investment, best efforts, or the like." *Race Tires Am, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (internal quotation omitted). Indeed, the Second Circuit has gone so far as to say that "exclusive distributorship arrangements are presumptively legal." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006). However, such arrangements are not exempt from antitrust scrutiny, as they have the potential to "exclude competitors or new entrants from a needed supply, or to allow one supplier to deprive other suppliers of a market for their goods." *Geneva Pharm.*, 386 F.3d at 508.

Plaintiff offers two theories as to why Express Scripts' exclusive distribution of Acthar is anticompetitive. First, Plaintiff argues that exclusive distribution through Express Scripts prevents other distributors from pushing back on Mallinckrodt's aggressive price increases, allowing Acthar's price to shoot into the stratosphere. Yet this theory flies in the face of conventional economic wisdom, as normally a manufacturer prefers to have multiple distributors competing for its products, as such competition will tend to support higher prices. *See E & L Consulting*, 472 F.3d at 30 (explaining that "a firm with a monopoly at the retail distribution level will further reduce output to maximize its profits, thereby reducing the sales and profit of the monopoly manufacturer"). If there is something unique at play in the pharmaceutical distribution market, Plaintiff fails to explain what it is. Consequently, Plaintiff's first theory of anticompetitive harm is implausible.

---

[7] For claims concerning exclusive distributorship arrangements, the analysis of Section 56:9–3's "anticompetitive effects" requirement is essentially the same as for Section 56:9–4(a)'s "overt acts" requirement. *City of Rockford*, 360 F. Supp. 3d at 756. But reader beware—sometimes the analysis for these requirements can be quite different.

Second, Plaintiff contends that the exclusive distributorship served to keep potential competitors to Acthar, such as Synacthen, off the market. Notably, the *City of Rockford* court approved of this theory when denying Mallinckrodt and Express Scripts' motions to dismiss in that case. *See City of Rockford*, 360 F. Supp. 3d at 749 (explaining that "[t]he goal of the exclusive dealing arrangement was to . . . prevent a competitive product from entering the market. Express Scripts employed its market power to effectuate [this] goal[]" (internal quotation omitted)). The theory also finds some support from the Supreme Court's decision in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). In that case, the Court noted that resale price maintenance agreements can be abused by "[a] manufacturer with market power . . . to give retailers an incentive not to sell the products of smaller rivals or new entrants." *Id.* at 894 (citing Howard P. Marvel & Stephen McCafferty, The Welfare Effects of Resale Price Maintenance, 28 J. L. & Econ, 363, 366–68 (1985) (describing historical examples of how dominant manufacturers used resale price maintenance in conjunction with exclusivity agreements to induce distributor loyalty, and how those distributors accordingly refused to deal with new competitors to the manufacturers)). Although this case does not concern a resale price maintenance agreement, by making Express Scripts the exclusive distributor of Acthar and then dramatically increasing the price, Mallinckrodt may very well have hoped to incentivize Express Scripts to refuse to deal with its potential rivals.

However, there is no indication that Express Scripts actually took any steps to harm or exclude any of Acthar's potential competitors. *Cf. Geneva Pharm.*, 386 F.3d at 492–93 (allowing challenge to exclusive dealing relationship between supplier and manufacturer to survive summary judgment where supplier actively dissuaded potential competitor to manufacturer from entering the market and lied about the existence of the exclusive dealing arrangement). Further, there is no

firm indication that any such steps would have actually prevented a potential competitor from entering the market, as Plaintiff makes no specific allegations concerning Express Scripts' market power. Consequently, Plaintiff's second theory of anticompetitive harm is not viable as currently pleaded.[8] And without a viable theory harm, Plaintiff's Section 56:9–3 challenge to the ASAP Program must be dismissed.

### ii. *Synacthen Acquisition Claim Against Express Scripts*

Plaintiff appears to suggest that Express Scripts was involved in Mallinckrodt's decision to acquire the rights to Synacthen from Novartis in 2013 in order to prevent Synacthen from coming to market. (FAC at ¶¶ 498–507, 631). An agreement between Mallinckrodt and Express Scripts as to who would acquire Synacthen could constitute bid-rigging, which is a *per se* antitrust violation. *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1192 (3d Cir. 1984) (noting that bid-rigging is a *per se* violation of Sherman Act Section 1); *United States v. Joyce*, 895 F.3d 673, 677–79 (9th Cir. 2018) (same). However, Plaintiff would still need to adequately allege the existence of such an agreement.

"To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). "Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* By contrast, to succeed on a circumstantial approach, the plaintiff must plead parallel behavior on the part of the defendants that "raises a suggestion of a preceding agreement, not merely parallel conduct that could just as

---

[8] Plaintiff may protest that even if Express Scripts did not directly refuse to deal with new entrants, the exclusive dealing relationship may still have induced it to cooperate in Mallinckrodt's illegal marketing scheme for Acthar. However, the Supreme Court has held that even when firms implement a vertical restraint in order to perpetrate an illegal fraud, the restraint cannot be condemned under antitrust law unless the plaintiff shows harm to competition. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137–138 (1998) (finding that plaintiff still needed to show anticompetitive harm from vertical boycott even though said boycott was part of an attempt to defraud a regulatory agency).

well be independent action." *Twombly*, 550 U.S. at 557. In order to raise this suggestion, the plaintiff may rely on three "'plus factors[]' that end to demonstrate the existence of an agreement: '(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.'" *Burch*, 662 F.3d at 227 (quoting *In re Insur. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010)). Importantly, "[r]equiring plausibility to infer an agreement from circumstantial evidence 'does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Burch*, 662 F.3d at 227 (quoting *Twombly*, 550 U.S. at 556).

Plaintiff does not allege any direct evidence of an agreement between Mallinckrodt and Express Scripts relating to Synacthen. Rather, Plaintiff alleges that Express Scripts was complicit in the Synacthen acquisition because it did not "force Mallinckrodt to either bring Synacthen to market as a competitor to Acthar or license the drug to another company to compete with Acthar." (FAC at ¶ 481). In support of its claim that Express Scripts had the power to force Mallinckrodt to bring Synacthen to market, Plaintiff notes that when Turing Pharmaceuticals, LLC ("Turing") increased the price of Daraprim 5000%, Express Scripts worked with another drug manufacturer to develop a lower-cost alternative to Daraprim. (*Id.* at ¶¶ 460–63). By failing to counteract Mallinckrodt's aggressive pricing strategy as it had done with Turing's, Express Scripts acted contrary to its economic interest, at least according to Plaintiff.

However, this theory is constrained by Plaintiff's own pleading, as it alleges that "[t]he only potential substitute [for Acthar] was Synacthen." (FAC at ¶ 485). Plaintiff also alleges that Mallinckrodt's 2013 purchase of BioVectra gave Mallinckrodt full control over the only supplier of the Acthar API, making it impossible to develop a generic ACTH competitor to Acthar. (FAC

at ¶ 564). These allegations indicate that there was no way for Express Scripts to develop a competitor drug after Mallinckrodt's acquisition of Synacthen, and Plaintiff describes no other way by which Express Scripts could have forced Mallinckrodt to bring Synacthen to market. Lacking any "plus factors," Plaintiff has not plausibly alleged the existence of an agreement between Mallinckrodt and Express Scripts regarding Synacthen, and thus Plaintiff's claim against Express Scripts must be dismissed.

### iii.   *Synacthen Acquisition Claim Against Mallinckrodt*

By contrast, there is no dispute that Mallinckrodt entered into an agreement with Novartis to acquire the rights to Synacthen. But as there is no *per se* rule against acquisitions, Plaintiff must establish that the acquisition had an adverse effect on competition in order to collect damages. Plaintiff must also "assert an antitrust injury[,] 'which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *EJ MGT LLC v. Zillow Grp., Inc.*, No. 18-584, 2019 WL 981649, at *4 (D.N.J. Feb. 28, 2019) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mart, Inc.*, 429 U.S. 477, 489 (1977)); *see Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir. 1980) (noting that an antitrust plaintiff must show that the defendant's "illegal conduct was a material cause of its injury").

Mallinckrodt's sole argument against its antitrust liability for the Synacthen acquisition is that Plaintiff cannot establish the causation element of antitrust injury. (Doc. No. 49-2 at 27–28). This argument fails. Plaintiff alleges that "[b]ut-for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price." (FAC at ¶ 531). This allegation is sufficient for Plaintiff's claim to survive a motion to dismiss.

Mallinckrodt contends that Plaintiff's causation theory is too speculative because it is unclear whether Retrophin or another bidder could have actually brought Synacthen to market as a competitor to Acthar, particularly due to the difficulty of obtaining FDA approval. (Doc. No. 49-2 at 27–28). However, there are two reasons why Mallinckrodt's contentions do not prevail. First, assessing whether another firm could have successfully brought Synacthen to market is the sort of fact-intensive inquiry that is inappropriate to resolve on a motion to dismiss. *See Brader v. Allegheny General Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) (noting that "the existence of 'antitrust injury' is not typically resolved through motions to dismiss"); *cf. Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (explaining that "district courts within this Circuit have declined to hold that the absence of FDA approval creates a barrier to establishing the element of causation in a patent antitrust suit" and collecting cases).

Second, Mallinckrodt's argument presumes that Plaintiff may only pursue an actual potential competition theory with respect to Synacthen, rather than a perceived potential competition theory. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) (explaining that "[t]he perceived potential competition theory posits that if market participants believe that a firm outside of the market is likely to enter, that perception can have a procompetitive effect on the market (whether or not that firm is actually likely to enter)" (citing *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 624–25 (1974); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32 (1973) (adopting perceived potential competition doctrine))); *see also United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 174 (1964) ("The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated."). Plaintiff has alleged that Mallinckrodt perceived

Synacthen to be a potential competitor long before the acquisition, and its effort to keep Synacthen out of Retrophin's hands suggest that perceived Retrophin as a genuine competitive threat. (FAC at ¶¶ 504, 523–25). Due to this perception, a Synacthen-equipped Retrophin may have been able to constrain Mallinckrodt's pricing of Acthar, even if its chances of actually bringing Synacthen to market were slim. Whether Mallinckrodt really perceived Synacthen and Retrophin as potential competitors is an issue that will have to await discovery.

### E.  NJ RICO (Counts III)

In Count III of the Amended Complaint, Plaintiff brings a claim under N.J.S.A. 2C:41–2(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." Plaintiff alleges that Defendants made numerous misrepresentations when implementing the "distribution scheme," the "pricing scheme," an the "marketing scheme," and that these fraudulent acts amounted to an illegal "pattern of racketeering activity" in violation of Section 2C:41–2(c). (FAC at ¶¶ 637–38).

To state an claim under Section 2C:41–2(c), the plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by, or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Marina Dist. Dev. Co., LLC v. Ivey*, 216 F. Supp. 3d 426, 436 (D.N.J. 2016). Further, the plaintiff must "make two related but analytically distinct threshold showings . . . (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was

proximately caused by the defendant's [RICO] violation." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

New Jersey courts look to case law on the federal RICO statute when interpreting NJ RICO. *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 510 (3d Cir. 2006). At the same time, "NJ RICO is broader in scope and is construed more liberally than the federal RICO statute." *Fimbel v. Fimbel Door Corp.*, No. 14-1915, 2014 WL 6992004, at *5–6 (D.N.J. Dec. 10, 2014) (citing *State v. Bisaccia*, 724 A.2d 836, 846 (N.J. Super. Ct. App. Div. 1999)).

### i. *Cognizable Injury*

Plaintiff's theory of injury is that Defendants' various "schemes" fraudulently stoked demand for Acthar, caused Plaintiff to pay an inflated price. Express Scripts contends that this theory of injury is not a cognizable under NJ RICO, relying on the Third Circuit's decision in *Maio*, which rejected the plaintiffs' theory that they overpaid for a health insurance plan because they did not allege that the "health care they received . . . actually was compromised or diminished as a result of [defendant]'s management decisions challenged in the complaint." 221 F.3d at 488. Thus, Express Scripts contends that Plaintiff must allege that the dose of Acthar it purchased failed to perform as expected in order to satisfy NJ RICO's injury requirement. (Doc. No. 50-1 at 40).

However, in *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, the Third Circuit held that a group of TPPs had suffered a cognizable RICO injury when they overpaid for a drug due to the manufacturer's deceptive marketing practices. 804 F.3d 633, 639–40 (3d Cir. 2015). The court distinguished *Maio* on the basis that while the *Maio* plaintiffs' injury depended on the quality of the health care they received under the defendant's insurance plan, the TPP's injury was solely due to the inflationary effect of the defendant's fraud on the price of the drug. *Id.* at 640 (explaining that "the fraudulent behavior alleged in [the plaintiffs'] complaint has

already occurred, and its effect on the price of [the drug] is not contingent on future events"). Therefore, far from being foreclosed by Third Circuit precedent, Plaintiff's theory of injury has actually been explicitly endorsed.[9] The Court will not dismiss Plaintiff's NJ RICO claims on this basis.

### ii. *Pattern of Racketeering Activity*

To show a "pattern of racketeering activity," the plaintiff must allege "at least two incidents of racketeering conduct." N.J.S.A. 2C:41–1(d)(1). Plaintiff alleges that Defendants have committed multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. The elements of mail fraud are : "(1) the existence of a scheme to defraud; (2) the use of the mails . . . in furtherance of the fraudulent scheme; and (3) . . . participation by the defendant with specific intent to defraud." *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005). Similarly, the elements of wire fraud are:"(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of interstate wire communications in furtherance of the scheme." *United States v. Andrews*, 681 F.3d 509, 528 (3d Cir. 2012) (internal quotation omitted). While "[e]xpress falsehoods lie at fraud's core," a "fraudulent or false representation may be effected by deceitful statements or half-truths or the concealment of material facts." *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017) (internal quotation omitted). Allegations of mail fraud or wire fraud must meet Rule 9(b)'s pleading standard. *Marangos v. Swett*, 341 F. App'x 752, 757 (3d Cir. 2009). Plaintiff has failed to meet this standard with respect to any of Defendants' "schemes."

### 1. The Pricing Scheme and the Distribution Scheme

---

[9] Express Scripts does not cite *In re Avandia* in any of its briefing, instead relying on *Maio* and district court decisions issued before *In re Avandia* came down. Express Scripts' failure to address this clearly relevant Third Circuit precedent is troubling.

Plaintiffs does not identify any specific misrepresentations Defendants made in the course of the "distribution scheme." Turning to the "pricing scheme," Plaintiff seems to contend that Mallinckrodt misrepresented Acthar's AWP to pharmaceutical industry publications relied on by Plaintiff. (FAC at ¶¶ 242–43). However, Plaintiff fails to explain what was misleading about the AWPs Mallinckrodt reported—after all, the Amended Complaint suggests that the listed AWP was the price actually charged to end payors in the market. (*Id.* at ¶ 209).[10]

Plaintiff also points to a number of allegedly false statements Defendants made concerning Acthar's price. Specifically, it highlights Mallinckrodt CEO Mark Trudeau's 2018 statements that the price of Acthar was $36,382, (*id.* at ¶ 233), his later statement that the price was $38,892, (*id.* at ¶ 238), and Express Scripts Senior Vice President Everett Neville's 2017 statement that Acthar is overpriced. (*Id.* at ¶ 252). But Plaintiff fails to supply any allegations showing that these statements were false—indeed, by its theory, Everett's statement was true.[11] Consequently, Plaintiff has failed to allege that any aspect of the "distribution scheme" or the "pricing scheme" amounted to wire fraud or mail fraud.

## 2.   The "Marketing Scheme"

In describing the "marketing scheme," the Amended Complaint lays out various forms of potentially fraudulent activity, including that Mallinckrodt KOLs and MSLs promoted Acthar for off-label uses, that Mallinckrodt offered bribes and kickbacks to doctors in exchange for

---

[10] Plaintiff relies on *In re Insulin Pricing Litigation*, which found that the artificial inflation of a drug's AWP by its manufacturer could constitute mail fraud or wire fraud. No. 17-699, 2019 WL 643709, at *5 (D.N.J. Feb. 15, 2019). However, in that case the plaintiffs alleged that the defendant manufacturers were secretly offering substantial discounts to certain distributors, meaning that the published AWPs were inaccurate. *Id.* at *3. Plaintiff makes no comparable allegation here.

[11] Plaintiff alleges that it only paid $26,100.28 for the dose of Acthar that it purchased in 2018, which does conflict with Trudeau's representations of Acthar's price. (*Id.* at ¶ 29). But on each occasion, Trudeau added the caveat that Mallinckrodt offers discounts to payors. (*Id.* at ¶¶ 233, 238). While Plaintiff asserts that this was itself a misrepresentation, as it claims that Mallinckrodt does not offer any discounts to TPPs, (*id.* at ¶ 234), the fact that Plaintiff paid only $26,100.28 means that it must have received some sort discount, given that Plaintiff repeatedly alleges that Acthar was genuinely priced at over $40,000 in 2018. (FAC at ¶¶ 37, 232, 234, 553).

prescribing Acthar, and that Mallinckrodt illegally subsidized patient copays through the PAP. Nevertheless, Mallinckrodt and Express Scripts assert that Plaintiff fails to identify any actionable misrepresentations or omissions in connection with this activity, and that to the extent they are identified, these misrepresentations and omissions are not pleaded with the particularity required by Rule 9(b). (Doc. No. 49-2 at 34–35; Doc. No. 50-1 at 44–46).

In its briefing, Plaintiff does not respond to Defendants' assertions, and the Court is inclined to agree that Plaintiff has failed to satisfy Rule 9(b)'s pleading standard. Plaintiff's allegations of off-label marketing are mostly vague and conclusory, and even when they are more specific, they fail to establish that the misrepresentations actually resulted in more Acthar prescriptions being written, such as with the allegations concerning the 2013 dinners that Pratta hosted.[12] (FAC at ¶¶ 410–13). Further, Plaintiff offers no explanation as to why Mallinckrodt's non-disclosure of its payments to KOLs and its role in the PAP amount to actionable omissions. *See Washington Cty. Bd. of Edu. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 714 (D. Md. 2020) (holding, in an Acthar fraud case with materially similar allegations, that "[t]he PAP may well have violated an antikickback statute . . . but [p]laintiff has not identified a misrepresentation related to the PAP that is actionable"). In light of Plaintiff's failure to point out which specific aspects of the "marketing scheme" involved mail fraud and wire fraud, the Court must dismiss Plaintiff's substantive NJ RICO claim.[13]

---

[12] Plaintiff does provide some more specific allegations concerning Mallinckrodt's relationship with certain KOLs, but even in these instances it fails to identify what the specific misrepresentations were. For example, Plaintiff alleges that Mallinckrodt provided funding to a Dr. James A. Tumlin to conduct and publish studies on the use of Acthar to treat non-FDA-approved indications, but Plaintiff does not explain what specific false representations Dr. Tumlin may have made. (FAC at ¶¶ 317–33).

[13] Notably, in *Humana Inc. v. Mallinckrodt ARD LLC*, yet another Acthar antitrust/RICO case, the court found that a TPP had adequately pleaded predicate acts of wire fraud and mail fraud for its federal RICO claim against Mallinckrodt relating to its marketing of Acthar. No. 19-6926, 2020 WL 3041309, at *12 (C.D. Cal. Mar. 9, 2020). Most saliently, the *Humana* plaintiff alleged that: (1) there was a set of doctors who received substantial sums from Mallinckrodt to promote Acthar; (2) these doctors knew that this remuneration violated federal law; and (3) when obtaining authorization to prescribe Acthar from TPPs, including the plaintiff, these doctors affirmatively represented

### F.  NJ RICO Conspiracy (Count IV)

Plaintiff also alleges that Defendants conspired to violate NJ RICO, triggering liability under N.J.S.A. 2C:41–2(d). However, NJ RICO conspiracy claims "necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 529 (D.N.J. 2011). Because Plaintiff has failed to state a claim under Section 2C:41–2(c), its Section 2C:41–2(d) claim also fails.

### G.  Negligent Misrepresentation (Count V)

"[U]nder New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information." *Highlands Ins. Co. v. Hobbs Grp., LLC*, 373 F.3d 347, 351 (3d Cir. 2004); *see also H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142–43 (N.J. 1983) ("An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance."), *superseded by statute on other grounds as stated in Finderne Mgmt. Co. v. Barrett*, 809 A.2d 857 (N.J. Super. Ct. App. Div. 2002).

In this Count, Plaintiff only seeks to hold Defendants liable for the alleged misrepresentations they made as part of the "pricing scheme." (FAC at ¶ 672–74). But as discussed above, Plaintiff has failed to establish that any of Defendants' statements concerning the price of Acthar were actually false or misleading. *See City of Rockford*, 360 F. Supp. 3d at 777 (noting that

---

that they were not violating state or federal law. *Id.*; First Amended Complaint, *Humana Inc. v. Mallinckrodt ARD LLC.*, No. 19-6926, at ¶¶ 30, 117–18 (C.D. Cal. Oct. 2, 2019) (Doc. No. 46). Plaintiff's Amended Complaint hints at similar conduct, but perhaps due to the Amended Complaint's extreme lack of organization, this theory of misrepresentation never clearly coalesces. If Plaintiff wishes to pursue such a theory, it must attempt to amend its complaint.

"high prices do not in and of themselves constitute false representations"). Thus, Plaintiff's negligent misrepresentation claim must be dismissed.

### H.  Civil Conspiracy (Count VI)[14]

Under New Jersey law, "[a] civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993). As such, civil conspiracy claims require both an agreement and "[s]ome act that is itself a tort . . . committed by one of the parties in pursuance of the agreement." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (noting that "[m]ere agreement to do a wrongful act can never alone amount to a tort").

The torts underlying Plaintiff's civil conspiracy claim are its NJCFA, NJAA, NJ RICO, and negligent misrepresentation claims. As discussed, only Plaintiff's NJAA claim against Mallinckrodt is surviving these motions to dismiss. Consequently, Plaintiff has failed to allege that Defendants both agreed to commit a tort and that a tort was actually committed in furtherance of that agreement. Thus, Plaintiff's civil conspiracy claim must be dismissed.

### I.  Unjust Enrichment (Count VII)

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Grp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). To state an unjust enrichment claim, the plaintiff must allege that "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances

---

[14] Plaintiff's Amended Complaint indicates that it is bringing a claim for "conspiracy/aiding and abetting," but its briefing only discusses conspiracy, rather than the separate claim of aiding in the commission of a tort. (Doc. No. 44 at 37–38; Doc. No. 45 36–37). Therefore, the Court assumes that Plaintiff is only attempting to bring a civil conspiracy claim.

that would make it unjust for defendant to retain benefit without paying for it." *Gov't Emp. Insur. Co. v. Ningning He*, No. 19-9465, 2019 WL 5558868, at *5 (D.N.J. Oct. 29, 2019) (internal quotation omitted). Further, "the plaintiff must allege a sufficiently direct relationship with the defendant to support the claim." *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 711 (D.N.J. 2011).

While Plaintiff insists that it is bringing a quasi-contract unjust enrichment claim, it is plain that Plaintiff's allegations against Defendants sound in tort. In the tort setting, plaintiffs cannot proceed on an unjust enrichment claim once their traditional tort claims have been dismissed. *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 936–37 (3d Cir. 1999).

Because the Court is dismissing all of Plaintiff's other claims against Express Scripts, it must also dismiss Plaintiff's unjust enrichment claims against it. However, Plaintiff's NJAA claim against Mallinckrodt is surviving, and thus so may its unjust enrichment claim. Mallinckrodt's argument that Plaintiff has failed to allege a sufficiently direct relationship with  Mallinckrodt is unpersuasive: Plaintiff has alleged that Mallinckrodt sold Acthar on consignment, retaining title until the time of sale, meaning that Plaintiff was effectively buying directly from Mallinckrodt. Thus, Plaintiff's unjust enrichment claim against Mallinckrodt remains viable.

## V.    PRATTA'S MOTION TO DISMISS THE AMENDED COMPLAINT

In addition to Mallinckrodt and Express Scripts, Plaintiff also names Pratta as a defendant in every count of the Amended Complaint. However, Plaintiff's allegations against Pratta are extremely conclusory; it does little more than allege that Pratta was an employee of Mallinckrodt during the relevant time period, other than to describe two dinners in 2013 where she allegedly misrepresented the efficacy of Acthar. (FAC at ¶¶ 413–14). Plaintiff's claims against Pratta fail

for the same reasons most of its claims against Mallinckrodt and Express Scripts fail: there are no non-conclusory allegations that Pratta was involved in any anticompetitive activity, nor any particularized allegations that she made any representations that actually inflated Acthar's price. All of Plaintiff's claims against Pratta must be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Transfer is **DENIED**; Mallinckrodt's Motion to Stay is **DENIED**; Mallinckrodt, Express Scripts, and Pratta's Motions to Dismiss are **DENIED** as moot; the Motions to Strike are **DENIED**; Mallinckrodt's Motion to Dismiss the Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**; and Express Scripts and Pratta's Motions to Dismiss are **GRANTED**.


Dated: 8/18/2020                                    /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge